**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MARLA WOODS, ) | |
| ) | CASE NO.   1:08-cv-0758 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE VECCHIARELLI |
| ) | |
| MICHAEL J. ASTRUE, ) | |
|   Commissioner of Social Security, ) | **MEMORANDUM OF OPINION** |
| ) | |
| Defendant. ) | |

This case is before the magistrate judge by the consent of the parties. Plaintiff, Marla Woods ("Woods"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Woods' application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the court AFFIRMS the decision of the Commissioner.

I.  Procedural History

Wood filed applications for DIB and SSI on February 18, 2003, alleging disability as of March 29, 2002.  Her applications were denied initially and upon reconsideration.

Woods timely requested an administrative hearing.

Administrative Law Judge Wanda Zatopa ("ALJ Zatopa") held a hearing on January 4, 2005. Woods, represented by counsel, testified on her own behalf at the hearing. Robert Mosely testified as a vocational expert. ALJ Zatopa issued a decision on February 28, 2005 in which she determined that Woods is not disabled. Woods requested a review of the ALJ's decision by the Appeals Council. The Appeals Council accepted review of ALJ Zatopa's decision. The Appeals Council vacated ALJ Zatopa's decision and returned the case to the ALJ for an additional hearing.

A second hearing was held on October 18, 2005 before Administrative Law Judge Edmund Round ("ALJ"). Woods, represented by counsel, testified on her own behalf at the hearing. Barbara Burke testified as a vocational expert ("VE"). On January 26, 2006, the ALJ issued a decision in which he determined that Woods is not disabled. Woods requested a review of the ALJ's decision. When the Appeals Council declined further review on February 28, 2006, the ALJ's decision became the final decision of the Commissioner.

Woods filed an appeal to this court on March 25, 2008. Woods alleges that the ALJ erred by (1) failing to accord proper weight to the opinion of Woods's treating physician and (2) conducting a faulty assessment of Woods's credibility by failing to consider Woods's documented obesity. The Commissioner denies that the ALJ erred.

## II. Evidence

*A.     Personal and Vocational Evidence*

Woods was born on December 31, 1951 was 54 years old at the time of her second hearing. She is a high school graduate and has past work experience as a stuffer, a

2

handpackager, and a housekeeping cleaner.

*B.   Medical Evidence*

Woods suffers from spinal stenosis, dextroscoliosis of the lumbar spine, status post quadriceps tendon repair, asthma, Marfan's syndrome, glaucoma, hypertension, diabetes mellitus, and obesity.  As the relevant issues are the opinion of Woods' physician related to her back and knee pain and her obesity, the medical history will address only those issues.

Woods fell on her right knee in late November 2000.  Transcript ("Tr."), p. 126.  The treating physician, Dr. Matthew E. Levy, diagnosed her as suffering from a patellar tendon rupture, and she was operated on several days later.  She was prescribed a leg brace and physical therapy.  Within three weeks of surgery, Dr. Levy found that she was doing quite well, with good healing and a good straight leg raise.  By February 2, 2001, Dr. Levy opined that Woods had recovered sufficiently to return to work without limitations.  Tr. at 125.

On March 29, 2002, Dr. Levy examined Woods' knee.  Tr. at 123.  He found good healing, no swelling, and a range of motion from full extension to 120° flexion.  X-rays revealed minimal degenerative changes and the patella adequately seated.  Woods complained, however, that she suffered from significant pain if she stood more than an hour.  Dr. Levy wrote her a note declaring that Woods was permanently restricted from standing for more than an hour.  Tr. at 123-24.  He did not otherwise restrict Woods' activities.

Dr. Franklin D. Krause examined Woods at the request of the Bureau of Disability Determination ("the Bureau") on April 24, 2003.  Tr. at 128-34.  Woods was five feet five and a half inches tall and weighed 248 pounds.  Woods reported suffering from achiness

3

and tiredness in her right knee and that she could sit, stand, and walk for about an hour. She also reported occasional clicking in the right knee and pain in the lumbrosacral junction that occasionally radiated up the dorsal spine. Woods used a cane. Dr. Krause found no redness, warmth, swelling, or grinding in the knee. Tests on Woods' knee revealed full range of motion and normal strength. X-rays of her lower back indicated a degenerative joint disease of the facet joints with a degenerative disc at L5-S1, but no spondylolisthesis. After examining x-rays and the results of muscular testing, Dr. Krause diagnosed Woods as suffering from a history of disruption of the right patellar tendon, status post surgery with minimal degenerative arthritis of the right knee; history of intermittent low back pain with a full range of motion without reflex asymmetry, atrophy, loss of strength, or loss of sensation; history of Marfan's syndrome with secondary glaucoma and satisfactory vision; and exogenous obesity. Dr. Krause noted in relevant part, "This patient had surgical repair of her right patellar tendon and this appears to have done well. . . . Range of motion of the lumbar spine is full. She lives by herself and carries on all activities of daily living." Tr. at 129.

Woods was treated at MetroHealth Hospital for lower back pain from June 12, 2003 through January 7, 2004. Tr. at 171-201. Woods initially complained of pain in her lower back, aggravated by standing, sitting, bending forward, and extending. She also reported difficulty walking. There was no radiation of pain, weakness, numbness, tingling, or incontinence, and testing showed some decreased range of motion and strength. Woods also exhibited an antalgic gait. Imaging revealed scoliosis and degenerative changes in the lumbrosacral spine but no spondylolisthesis. Woods was taking Tylenol and ibuprofen for the pain, but these medications were not helping. Woods was prescribed physical

4

therapy and Naprosyn.

When aquatic therapy proved ineffective in helping Woods, her therapist switched her to other forms of therapy on August 4, 2003. Tr. at 186-87. Therapy and "back school" resulted in some improvements in strength, range of motion, and body mechanics, but Woods still complained of pain when therapy concluded on August 25, 2003. Tr. at 182-83. Woods' therapist told her at the conclusion of therapy to continue at home the exercises that she had been taught.

Dr. Lutul D. Farrow examined Woods at MetroHealth on October 10, 2003. Tr. at 181. Woods reported that physical therapy had given her some relief from lower back pain, but lower back pain was still fairly constant. Woods declared that her pain was worst with physical activity and that she could only walk a few blocks without resting her back. She also said that it hurt when she was lying down. Dr. Farrow noted that Woods walked stooped over, and Woods reported that she leans on the cart when shopping. Dr. Farrow thought her symptoms consistent with lumbar arthritis. Woods did not want surgery at that time.

Dr. Jaime Castellanos-Vaquez examined Woods on November 17, 2003. Tr. at 177. Woods weighed 245 pounds. Dr. Castellanos referred Woods to an orthopedic doctor.

The orthopedist examined Woods on February 12, 2004. Tr. at 210. Woods reported back pain at five on a ten-point scale, a worsening of back pain when standing or walking, and chronic right knee pain. There was no numbness, tingling, or incontinence. An MRI revealed degenerative changes with a herniation at L4-L5. After discussing treatment options, Woods elected non-operative management of her back problem.

On April 5, 2004, Dr. Castellanos examined Woods and completed an assessment

of Woods at the request of the county department of human services. Tr. at 204-05, 213-14. Woods reported back pain at four on a ten-point scale, but there were no other abnormalities related to her back or knee. Dr. Castellanos noted that Woods had a recent MRI but did not indicate that he had seen the results of the MRI. He reported Woods' weight as 248 pounds. In completing his assessment of Woods, Dr. Castellanos opined that Woods could stand or walk for 2-3 hours in an eight-hour workday and for 45 minutes without interruption, could sit for four hours in an eight-hour workday and for one hour without interruption, could frequently lift five to ten pounds, and was extremely limited in her ability to bend. When asked whether Woods was employable or unemployable, he chose "unemployable." Dr. Castellanos, however, did not provide any observations or medical evidence that led to these findings, as requested by the form provided by the county department of human services.

Dr. Castellanos saw Woods again on May 10, 2004. Tr. at 211-12. Woods told him that she needed disability forms completed. She reported that her lower back pain was unchanged and that she was unable to sit for long periods of time. Woods weighed 248 pounds, and Dr. Castellano noted her need to lose weight.

Woods visited Dr. Amanda Lenhard on June 29, 2004 complaining that she had been experiencing shooting pain and numbness in her left thigh for three weeks. Tr. at 215-16. An examination revealed tenderness to palpation in the left paraspinal lumbar region, decreased sensation, and decreased patellar reflexes. Woods admitted that she had not been doing her home exercises. Dr. Lenhard prescribed Naprosyn and Neurontin and told her to do her exercises daily.

A follow-up visit on July 29, 2004 found Woods reporting pain of ten on a ten point

6

scale. Tr. at 217. On December 16, 2004, a second follow-up visit, Woods again reported pain of ten on a ten point scale radiating from her lower back to her left leg. Tr. at 274. She told the treating physician that Neurontin helped her pain but that she was currently out of the medication. They discussed referring Woods to pain management, but Woods said that she had been unwilling to perform injections in the past because of her diabetes. The treating physician concluded, "We feel that she is a non-operative candidate at this time and that she continue her back exercises at home . . . ." Tr. at 274. He renewed Woods' prescription for Neurontin.

Dr. Malli Thiruppathi saw Woods on June 7, 2005. Tr. at 280-81. Woods' weight was 223 pounds. Woods said that she was having difficulty walking because of right knee pain. She reported pain at seven on a ten-point scale. According to Woods, the pain had begun spontaneously about a month earlier, was aggravated by walking and bearing weight, and was relieved by resting. Dr. Thiruppathi detected crepitus in the right knee but no swelling or trauma. Range of motion in the right knee was normal, and a radiographic study revealed moderate narrowing of the medial knee joint with subchondral sclerosis of the medial femoral condyle and medial tibial plateau. Tr. at 282. There was no fracture, bone destruction, dislocation, or loose bodies.

Woods visited Dr. Castellanos on July 6, 2005. Tr. at 277-79. She told Dr. Castellanos that she had forms to be completed for social security benefits and needed a letter to certify that she was unable to climb stairs "for housing issues." Tr. at 277. Her weight was down to 219 pounds; she was five feet seven inches tall; and she reported that she had quit drinking alcohol about six months earlier. She had "no acute complaints" but reported pain at ten on a ten point scale. Tr. at 277. She continued to have back pain, but

it was stable, and she was doing her back exercises.  An examination found tenderness to palpation in the midline lumbar spine with strength and sensation preserved.  Dr. Castellanos noted that Woods was not a surgical candidate.  He wrote a note. addressed "To Whom It May Concern," averring that Woods had severe back and knee pain and could not climb up or down stairs. Tr. at 283.  He also completed a physical capacity assessment of Woods. Tr. at 284-85.  Dr. Castellanos opined in his assessment that because of severe back pain secondary to spinal stenosis, Woods could lift ten pounds maximum, eight pounds occasionally, and five pounds frequently.  He also opined that Woods could stand/walk for 20 minutes at a time up to four hours in an eight-hour work day; could sit for 30 minutes at a time up to eight hours in an eight-hour work day;  could rarely or never climb, kneel, or crawl; could occasionally  balance, stoop, or crouch; could occasionally push or pull; and could not work around heights, machinery, temperature extremes, or chemicals.  He did not cite any medical findings to support Woods' restrictions other than her limited ability to lift.  He also noted that Woods had been prescribed the use of a cane.

Dr. Castellanos saw Woods again on November 16, 2005 and completed another physical capacity assessment following this visit.  Tr. at 29-30.  In his assessment, Dr. Castellanos opined that because of moderate spinal stenosis with compression and radicular pain, Woods could lift 15 pounds maximum, five to ten pounds occasionally, and 5 pounds frequently.  He also opined that Woods could stand/walk for 45-60 minutes at a time up to two to three hours in an eight-hour work day; could sit for 45-60 minutes at a time up to four hours in an eight-hour work day;  could rarely or never climb, stoop, crouch, kneel, or crawl; could occasionally  balance; could occasionally push or pull, see, and engage in fine manipulation; and could not work around heights or machinery.  He cited

8

Woods' pain resulting from spinal stenosis, prescribed cane, and visual impairment as the medical findings supporting his assessment of Woods' limitations.[1]

*C.     Hearing testimony*

At the hearing on October 18, 2005, Woods testified that she was unable to work due to pain in her neck, back, and right knee. Tr. at 374. Woods declared that she could stand or sit for about a half hour at a time, had difficulty with stairs, and used a prescribed cane when she left the house. Tr. at 374-80. She was able to do small amounts of mopping, laundry, cooking, and cleaning. Tr. at 380. According to Woods, her previous job as a stuffer had been performed standing for about five or six hours a day, although workers were allowed to sit for some period of time to do the job when they were tired. Tr. at 373. The job required her to lift a 10 to 15 pound box occasionally,[2] although the men usually lifted the boxes. Woods described Dr. Castellanos as her primary physician and said that she had been seeing him, on average, about every three or four months for the past couple of years. Tr. at 380-81.

The ALJ asked the VE to consider a hypothetical worker 53 years old; having a high school degree but no relevant vocational training; limited to a range of light work; can sit, stand, or walk for six hours in an eight-hour day; capable of lifting, carrying, pushing, or pulling ten pounds frequently and 20 pounds occasionally; precluded from using ladders, ropes, or scaffolds; able to use stairs and ramps occasionally; precluded from kneeling and

---

[1] Woods submitted this document after the hearing. The ALJ does not cite it in his decision.

[2] Woods was vague about the actual weight of the box, and the VE later opined that the box weighed about ten pounds.

crawling; and occasionally able to stoop. When asked if such a person could perform Woods' past relevant work as a stuffer as performed or as listed and if such a person could perform Woods' past relevant work as a hand packager, the VE affirmed that such a person could perform those jobs.

### III. Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her

10

past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Social Security Act on March 29, 2002, the date she allegedly became unable to work, and continues to meet them through June 30, 2005.

2. The claimant has not engaged in substantial gainful work activity at any relevant time.

3. The claimant suffers from degenerative disc disease of the lumbar spine, the residual effects of right quadriceps tendon repair, and obesity, each of which is a severe impairment.

4. The claimant has no impairments, either individually or in combination, that meets or that is medically equivalent to the criteria of any impairment listed in appendix 1, subpart P, 20 C.F.R. part 404.

5. The claimant's assertions concerning her inability to work are credible to the extent of the limitations of her residual functional capacity.

6. The claimant retains the residual functional capacity to do a range of light work (20 C.F.R. §§ 404.1567, 416.967). Specifically, she can lift, carry, push and/or pull 10 pounds frequently and 20 pounds occasionally and can sit, stand and/or walk for 6 hours each in an 8-hour day with normal breaks. She can never use ladders, ropes, or scaffolds, can never kneel, and can never crawl. She can occasionally use stairs and ramps and can occasionally balance.

7. The claimant's past relevant work as a stuffer as she performed it and as typically performed, and as a hand packager as typically performed do not require the performance of work-related activities precluded by the above limitations. Therefore, the claimant's impairments do not prevent her from performing her past relevant work.

8. The claimant has not been under a disability, as defined in the Social

> Security Act, at any time through the date of this decision. 20 C.F.R. §§ 404.1520(f), 416.920(f).

Tr. at 26-27.

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI. Analysis

Woods alleges that (1) the ALJ erred by failing to accord controlling weight to the opinion of Woods's treating physician; (2) the ALJ erred by failing to provide a good reason for failing to give great weight to the opinion of the treating physician; and (3) the vocational expert incorrectly summarized Woods' statements regarding her past work. The Commissioner denies that the ALJ erred, denies that the VE's summary of Woods' past work was inaccurate, and contends that even if the VE's summary of Woods' past relevant work was inaccurate, any error was harmless error.

12

*A. Whether the ALJ erred in not giving proper weight to the opinion of Woods's treating physician*

Woods contends that the ALJ erroneously failed to accord at least significant weight to Dr. Castellanos' opinion. The Commissioner responds that the ALJ did not err because Dr. Castellanos' opinions were not due significant weight.

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner. *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983). Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988). Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion. *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986). The factfinder must, however, articulate a reason for not according the opinions of a treating physician controlling weight. *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987).

In determining that Dr. Castellanos' opinion was not due the deference normally given the opinion of a treating physician, the ALJ wrote as follows:

13

> Dr. Castellanos' assessment of Ms. Woods' functional capacity is not supported by the evidence. Further, he is a resident doctor, still in training (Exhibit 4F, page 8), and so his opinion is less persuasive than the opinion of a more experienced physician. The degree of limitation that Dr. Castellanos posits is not supported by sufficient corroborative medical evidence, such as current diagnostic tests, laboratory studies, and ongoing clinical findings (Social Security Ruling 96-2p; 20 C.F.R. §§ 404.1527, 416.927).
>
> For example, Dr. Krause commented that Ms. Woods appeared to have done well following surgical repair of her right knee and that her Marfan's syndrome affected only her vision, which is not severely impaired. She had a full range of motion of her lumbar spine and , although she was using a cane, she could walk without it. He also stated that she acknowledged that she could sit, stand and walk for about an hour.
>
> Therefore, I find the treating physician's opinion in Exhibit 13F (as well as his similar opinion on April 5, 2004, at Exhibit 5F) to be unpersuasive as to the degree of limitations posited, and not entitled either to controlling weight or special deference. Moreover, any ultimate opinion as to disability is reserved to the Commissioner under the Social Security Act and Regulations (cf. SSR 96-5p; and 20 C.F.R. §§ 404.1527, 416.927).

Tr. at 25.

Dr. Castellanos' opinions regarding Woods' physical functional capacities is supported only by a reference to Woods' severe back pain secondary to spinal stenosis.[3] There is no citation of direct functional tests of such things as muscle strength or range of motion, nor is there any reference to such objective signs as muscle tension or tenderness to palpation. Rather, Dr. Castellanos cites Woods' subjective reaction to a diagnosed condition. Moreover, Dr. Castellanos does not explain the connection between the degree of pain alleged by Woods and the degree of stenosis detected by radiographic studies.

Dr. Castellanos' treatment notes generally fail to provide any additional objective support for his opinions, as defendant notes. Defendant's Brief on the Merits (Doc. No. 17).

---

[3] In Dr. Castellanos opinion given a month after the hearing, Dr. Castellanos supports the opinion by reference to spinal stenosis with compression and radicular pain.

pp. 13-14. In Woods' four visits with him in 2003-2004, Dr. Castellanos referred to objective evidence of Woods' back and knee problems only once, when he referred on July 6, 2004 to an x-ray that showed osteoarthritis in the right knee and tenderness to palpation in the midline lumbar spine. On that day, Dr. Castellanos also noted that Woods had no acute complaints, that her back pain was stable, and that her strength and sensation were preserved. Consequently, it is impossible to determine on what objective evidence Dr. Castellanos based his opinions about the impact of Woods' back condition on her functional capacity.

Because Dr. Castellanos' opinions are not adequately supported by sufficient objective medical data and there is no explanation of the nexus between Dr. Castellanos' opinions regarding Woods' functional capacity and the physical findings, the ALJ was entitled to refuse to give Dr. Castellanos' opinions controlling weight. The ALJ's reliance, therefore, on the opinions of Dr. Krause, an examining physician, cannot be said to be error.

Woods also contends that the ALJ's explanation of why he failed to give controlling weight to Dr. Castellanos' is insufficient as a matter of law. She cites *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004), for the proposition that the regulations require the Commissioner to "give good reasons" for not giving controlling weight to the opinion of the treating physician. According to Woods, the following explanation from the ALJ is insufficient to satisfy that requirement:

> Dr. Castellanos' assessment of Ms. Woods' functional capacity is not supported by the evidence. Further, he is a resident doctor, still in training (Exhibit 4F, page 8), and so his opinion is less persuasive than the opinion of a more experienced physician. The degree of limitation that Dr. Castellanos posits is not supported by sufficient corroborative medical evidence, such as current diagnostic tests,

15

>laboratory studies, and ongoing clinical findings (Social Security Ruling 96-2p; 20 C.F.R. §§ 404.1527, 416.927).

Tr. at 25.

As the Commissioner notes, however, *Wilson* is distinguishable from the instant case. In *Wilson*, the ALJ's purported reason was actually no reason:

> In the instant case, the ALJ has violated § 1527(d)(2) by failing to give good reasons for his rejection of Dr. DeWys's opinion. According to Wilson, DeWys treated him from January of 1993 through at least May of 2000. Wilson submitted DeWys's opinion to the ALJ. The DeWys opinion identified greater restrictions on Wilson's ability to work than those ultimately found by the ALJ, and stated that these deficits had been in effect since December 31, 1993. The opinion also contains what Wilson claims are notes made by DeWys contemporaneous with his treatment of Wilson. The ALJ stated in his ruling that he had "considered" DeWys's opinion, but concluded that while "this opinion may be an accurate assessment of [Wilson's] current limitations, the undersigned must assess the claimant's limitations on March 31, 1995, the date he was last insured for benefits."
>
> The ALJ's summary dismissal of DeWys's opinion fails to meet the requirement that the ALJ "give good reasons" for not giving weight to a treating physician. It is uncontested that Dr. DeWys was Wilson's treating physician, and the record appears to make clear that Dr. DeWys treated Wilson during the period that he alleged he was disabled. *See e.g.,* J.A. at 176, 329. To state that Dr. DeWys's opinion "may be an accurate assessment," followed by a bald statement of the issue that the ALJ must ultimately resolve, can hardly amount to "giving good reasons" for rejecting Dr. DeWys's opinion.

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004).

In the instant case, the ALJ reviewed and summarized Woods' own statements about her condition, the examination by Dr. Krause, radiographic studies, the notes of Dr. Levy, Woods' participation in "back school," her consultations with an orthopedic specialist and Dr. Thiruppathi, and her regimen of medications as well as her consultations with Dr. Castellanos. Tr. at 21-15. The ALJ's explanation that Dr. Castellanos' assessment of Woods' functional capacity is not backed by sufficient corroborative medical evidence is an explanation warranted by 20 C.F.R. §§ 404.1527(d)(3) & 416.927(d)(3) and supported by

the record.[4] The case that Woods cites to for the proposition that the ALJ's explanation is insufficient is easily distinguishable. Woods' argument, therefore, is not well-taken.

*B.     Whether the VE incorrectly summarized Woods' past work*

Woods also argues that the VE incorrectly summarized Woods' testimony regarding her past work as a stuffer. Specifically, Woods contends that her testimony described the job as requiring her to stand for five to six hours a day, which would classify the job as being performed at the sedentary level of exertion. The VE, however, summarized Woods' testimony as describing a job at the sedentary level of exertion. Wood concludes that remand is appropriate to correct the VE's error and determine whether there are any jobs that Woods could perform at the sedentary level of exertion. The Commissioner denies that the VE erred. The Commissioner also notes that even if the job as a stuffer were properly classified at the light level, this would make no difference to the ALJ's determination that Woods is not disabled because the ALJ determined that Woods could do light work.

In describing her job as a stuffer at the hearing, Woods offered the following relevant testimony:

> Q     And on this job you did it mostly standing --
>
> A     Yes.
>
> Q     -- or sitting?
>
> A     Standing and sitting. Like you, if you got tired you could sit down, but it was mostly standing.

---

[4] As already noted, radiographic studies and a diagnosis of spinal stenosis, without more, are insufficient to support an allegation of substantially diminished functional capacity.

17

> Q. Okay. And out of a typical eight hour day how much of your time do you think you spent standing?
>
> A About five or six hours.
>
> Q Okay.
>
> A Five or six hours, but you could take -- you could sit down sometimes, but if you got tired -- some people can't work sitting down too good. They have to stand. But if you got tired you could sit down and still -- the work we did you could still do it standing or sitting.

Tr. at 373. The VE later opined that the job was best classified as Dictionary of Occupational Titles number 780.684-066. The VE concluded that this job is normally performed at the light exertional level, but the job as Woods described it was a sedentary job with a sit/stand option. Tr. at 387-88.

According to the regulations, "a sedentary job is defined as one which involves sitting, [but] a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a). Light work, on the other hand , "involves a good deal of walking or standing . . . ." 20 C.F.R. § 404.1567(b). Woods' testimony is somewhat ambiguous regarding how long she was allowed to sit while performing her job as a stuffer. But even if Woods' past job required more sitting than was warranted for sedentary work, the ALJ found that Woods was capable of light work, including standing or walking for up to six hours in an eight-hour day. As Woods' job as a stuffer required her to stand for five or six hours, that job as performed is within Woods' current capabilities. Thus, even if the VE erred, and it is not clear that the VE did err, the error made no difference to the outcome of the ALJ's decision. If there was error, it was harmless error.

"No principle of administrative law or common sense requires us to remand a case . . . unless there is reason to believe that remand might lead to a different result." *Fisher*

*v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). As there is no reason to believe that remand would lead to a different result in the instant case, remand is not appropriate to determine if the VE erred in describing the job as sedentary with a sit/stand option. Woods' argument is not well-taken.

### VII. Conclusion

For the reasons given above, the court AFFIRMS the decision of the Commissioner.

**IT IS SO ORDERED.**

s/ Nancy A. Vecchiarelli<br>
U.S. Magistrate Judge

Date:  January 21, 2008